**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MARGARET NORTH,**

        **Plaintiff,**

**-vs-**                                        **Case No. 6:08-cv-2020-Orl-31DAB**

**PRECISION AIRMOTIVE**
**CORPORATION, et al.,**

        **Defendants.**

_____

# ORDER

This matter comes before the Court on the Motion for Partial Summary Judgment (Doc. 91) filed by Defendant Precision Airmotive Corporation ("Precision"), the response (Doc. 104) filed by the Plaintiff, and the reply (Doc. 113) filed by Precision. The Motion for Partial Summary Judgment covers several different issues, but this order addresses only the damages issues raised in that motion.[1] These damages issues also implicate the expert testimony of William Partin ("Partin"). Accordingly, the Court has also considered Precision's Motion in Limine (Doc. 107) to exclude Partin's testimony, and the Plaintiff's response (Doc. 121) to that motion.

---

[1] As the Plaintiff points out, summary judgment is intended to dispose of actions or claims, not a portion of a claim. *See,* e.g., *Baker County Med. Servs., Inc. v. Summit Smith, L.L.C.*, 2007 WL 1229702 (Apr. 25, 2007 M.D.Fla.). With regard to the damages issues raised in the motion for partial summary judgment, Precision is seeking to dispose of only part of the Plaintiff's claim, and thus summary judgment on the damages issue would be improper. However, the Court may enter an order pursuant to Fed.R.Civ.P. 56(d) that frames and narrows triable issues if it finds that such an order would be helpful to advance the progress of the litigation. *See, e.g., Warner v. United States*, F.Supp.2d 877, 878 (S.D.Fla. 1988).

**I.     Background**

Robert North ("North") died on December 2, 2006, when his airplane crashed near Mt. Snow, Vermont. The Plaintiff is his widow and the administratrix of his estate. She contends that the crash was caused by the failure of an engine component manufactured by Precision's predecessor. She seeks to recover against Precision under theories of strict product liability, negligence, and misrepresentation.

At the time of his death, North was involved in the development of a condominium project known as Snow Vidda, in which he held a 50 percent ownership interest. Two investors had put up the money to buy the property, with North contributing so-called "sweat equity". In addition to having some previous experience in real estate development, North, a real estate broker for many years, had experience in marketing and selling vacation homes.

As originally envisioned, Snow Vidda was to consist of 56 vacation condominiums, with sales prices in the upper six figures. There is some dispute about the particulars, but it appears that the project received permit approvals and the first round of bank financing in Spring 2007, some weeks after North's death. (Doc. 104 at 22). Subsequently, the bulk of the construction commenced under the direction of a new manager, Sean McTigue ("McTigue"). Ultimately, the project ran into trouble. According to McTigue, 10 units were built (with three of those units only 40 percent complete) and only two were sold. (Doc. 92-8 at 45). The bank eventually stopped providing financing, and all work on the project stopped.

The Plaintiff seeks, on behalf of the estate, to recover the Snow Vidda profits allegedly lost due to North's death. The Plaintiff also seeks to recover lost support on behalf of North's three adult children. The children contend that North intended to provide them with business

opportunities in connection with the project, either in the form of a salaried position or opportunities to do things such as sell units or supply building materials.

The Plaintiff primarily relies on the testimony of forensic accountant William Partin ("Partin") to support the notion that North's death resulted in the failure of the Snow Vidda project, and to establish the amount of profits lost as a result of that failure. Partin's expert report, in turn, relies heavily on a 2008 appraisal performed by Wesley Reeks ("Reeks") to establish the value of the Snow Vidda project if it had succeeded.

## II.     Legal Standards

Under Florida law, lost profits must be established with a reasonable degree of certainty. *Brevard County Fair Ass'n, Inc. v. Cocoa Expo, Inc.*, 832 So. 2d 147, 152-53 (Fla. 5th DCA 2002) (citing cases). They cannot be based on mere speculation and conjecture. *Shadow Lakes, Inc. v. Cudlipp Const. & Development Co., Inc.*, 658 So. 2d 116 (Fla. 2d DCA 1995) (*citing Marshall Construction, Ltd. v. Coastal Sheet Metal & Roofing, Inc.*, 569 So. 2d 845 (Fla. 1st DCA 1990)). As a general rule, anticipated profits of a commercial business are too speculative and dependent on changing circumstances to warrant a judgment for their loss. 87 Fla. Jur. 2d *Damages* § 87 (2010). However, a business can recover lost prospective profits, even if the business is not yet established and has no track record of profitability, if it can be shown that (1) the defendant's actions caused the damage and (2) there is some standard by which the amount of damages may be adequately determined. *W.W. Gay Mechanical Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989).

### III.    Analysis

The Plaintiff contends that North's death in December 2006 caused the Snow Vidda project to fail.  (Doc. 104 at 21).  Precision contends that other factors – in particular the collapse of the American housing market and higher than expected construction costs – doomed Snow Vidda.  (Doc. 91 at 10-13).  Partin's expert report simply assumed that the project would have succeeded as planned, but for North's death.  (Doc. 92-2 at 8).  The Plaintiff offers five items allegedly demonstrating that Snow Vidda would have been successful if North had continued at the helm:

- McTigue's testimony that, in his opinion, had North not died, the project would have been completed.  (Doc. 92-8 at 93).  According to McTigue, the project failed because construction costs exceeded the budgeted figure of $340,000 and because of greater than expected carrying costs, such as upkeep and interest.  (Doc. 92-8 at 50).  McTigue described North as a "tremendous salesman" and stated that he believed that North would have been able to sell the completed units, thereby transferring the carrying costs to the buyers, and allowing the project to continue.  (Doc. 92-8 at 93).

- Reeks, who prepared a number of appraisals of the project for the bank that provided the financing, stated that two similar condominium projects in the area had construction ongoing and were selling units in 2008 and 2009.  (Doc. 104-11 at 10, 28).

- North's daughter, Sharon North Vilcins ("Vilcins"), who had construction and sales experience in the relevant market, stated that two condominium developments in the area sold quite well after North's death, and that a third was sold out.² (Doc. 104 at 23).

- McTigue did not have the same connections or experience in marketing vacation condominiums in the area as North had developed during his decades as a real estate broker. (Doc. 104 at 23).

- After North's death, his wife assumed the role of leader of the Snow Vidda project, and she "lacked sufficient liquidity to carry the project to completion." (Doc. 104 at 23-24).

These five items are not enough to convince a reasonable person that it is more likely than not that Snow Vidda would have succeeded but for North's death. The last two are based entirely on an affidavit that has been stricken, Doc. 151 at 1, and therefore offer no evidentiary support for the Plaintiff's contention.³ The second and third items are evidence that some condominiums were

---

²This is the Plaintiff's characterization, which does not jibe with the actual testimony. Vilcins was actually asked about sales at similar developments that had been built in the previous five years – a time frame that would predate North's death by about 18 months. (Doc. 104-8 at 17). Thus some or most of the sales to which she refers could have occurred before North could have brought any Snow Vidda units to the market. Vilcins also did not describe any of the developments as having sold "quite well" or use other words to that effect.

³Even assuming their truth, these two items do almost nothing to advance the Plaintiff's cause. The item regarding McTigue's lack of marketing experience is in essence merely a recasting of the first item – McTigue's testimony that North was a great salesman (which implied that North's successor was not). It also begs the question of why the project would have relied on the construction manager to also do the marketing and sales. As for the item regarding liquidity, the Plaintiff offers no explanation as to why her situation in that regard was materially different than the one her husband would have been in, but for the accident. Presumably she had access to essentially the same assets to which he would have had access if he had continued to run the Snow Vidda project. In addition, the Plaintiff fails to offer any examples of ways in which this purportedly diminished cash flow contributed to the failure of Snow Vidda (such as, for example, a temporary inability to procure needed supplies or equipment, bringing all production to a standstill).

being sold in the area after North died. But they do nothing to show that Snow Vidda's sales, would have been high enough for the project to succeed. There is no indication as to the number of units sold at these other developments after North's death, so there is no way to estimate whether enough Snow Vidda units could have been sold to save the project.[4] There is also no evidence as to the timing of these sales – *e.g..,* whether the sales occurred in the first months following the plane crash, before the additional Snow Vidda units could have been constructed, or after the latter part of 2007, as the American economy sank into recession and the housing bubble began to burst. Saying that some other developments had managed to sell some condos does little to show that North's death, rather than economic conditions, caused the failure of Snow Vidda. Finally, McTigue's assertion that North could have sold enough units to keep the project moving forward is sheer speculation, particularly in light of the absence of any evidence as to how many units would have needed to be sold, and at what rate, to continue the project.

Accordingly, the Court finds that the Plaintiff has failed to provide evidence from which a reasonable factfinder could conclude that North's death caused the failure of the Snow Vidda project. Accordingly, Partin will not be permitted to testify as to the amount of profits the Snow Vidda project would have earned if it had been completed.[5]

---

[4] Similarly, there is no indication as to how many units would have *needed* to be sold to save the project – *i.e.*, no indication as to how much each sale would have reduced carrying costs, how much money each sale would have freed up for additional construction, or anything of that nature.

[5] To be clear, the prohibition on this topic is not limited to evidence that might be introduced through Partin's testimony. Rather, at trial the Plaintiff will not be allowed to introduce evidence from any source of alleged lost profits on the Snow Vidda project.

### B. Children's claims

North's three adult children seek to recover lost support under Florida's Wrongful Death Act, Fla. Stat. §§ 768.16-768.26. According to the Plaintiff, Vilcin's company had a contract to supply timbers for the Snow Vidda project and to sell units; North's son Bobby was going to be the project manager for the venture; and his son Ryan, who runs a construction company, expected to receive referrals from his father. (Doc. 104 at 25-26). The Plaintiff contends that North's actions with regard to his children amount to expected "in kind" contributions and are therefore recoverable as "lost support." (Doc. 104 at 26). Because the Plaintiff cannot show that North's death caused the failure of the Snow Vidda project, she cannot recover those claims of the children that were dependent upon the success of that project.

Some of the children's claims did not grow out of the Snow Vidda project. Son Ryan, for example, seeks to recover the value of the referrals his father allegedly would have provided up through his retirement, not just in connection with Snow Vidda. Even setting aside the fact that these claims are speculative at best, all of the children's claims fail for a separate reason. The Wrongful Death Act permits "survivors" to recover "the value of lost support and services from the date of the decedent's injury to her or his death, with interest, and future loss of support and services from the date of death and reduced to present value." Fla. Stat. § 768.21(1). The act's definition of "survivors" includes the decedent's children, and is not limited to minor children. Fla. Stat. § 768.18(1). Despite this, North's children cannot recover, because theirs claimed losses do not constitute "lost support," as required by Section 768.21(1). Although the act does not itself define "support" – except to note that support can include contributions in kind, as well as money, Fla. Stat. § 768.18(3) – the term is commonly understood (in this context) to mean payments for

-7-

things that people require, such as groceries or medical care: "Maintenance, as of a family, with the necessities of life." *American Heritage Dictionary of the English Language* (4th ed.) (2009). In this case, there has been no showing that North was providing any such necessities for his adult children at the time of his death, or that the lost business opportunities were intended to provide any sort of maintenance. Accordingly, the Court finds that North was not providing "support" for his adult children, as that term is used in the Wrongful Death Act, and therefore the Plaintiff's claims for lost support on behalf of those children are barred.

Both the Motion for Partial Summary Judgment (Doc. 91) and the Motion in Limine to exclude Partin's testimony (Doc. 107) raise the Snow Vidda and support issues addressed above. Resolution of those issues in the context of the Motion for Partial Summary Judgment also resolves them for purposes of the Motion in Limine. Thus, the Motion in Limine will be denied as moot to the extent it raises those issues. The Motion in Limine raises one additional issue: Partin's valuation of the loss of goodwill in North Real Estate resulting from North's death. (Doc. 107 at 22-23). After considering the issue, the Court finds that it is best resolved at trial. Accordingly, the Motion in Limine will be denied without prejudice as to the lost goodwill issue.

In consideration of the foregoing, it is hereby

**ORDERED** that at trial the Plaintiff will not be permitted to present evidence of the losses allegedly resulting from the failure of the Snow Vidda project or the lost support allegedly suffered by North's children, via testimony from William Partin or otherwise. And it is further

**ORDERED** that the Motion in Limine as to William Partin (Doc. 107) is **DENIED IN PART AS MOOT** and **DENIED IN PART WITHOUT PREJUDICE**, as set forth above.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on December 10, 2010.

_____<br>
GREGORY A. PRESNELL<br>
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party