**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MARGARET NORTH,**

               **Plaintiff,**

**-vs-**                                     **Case No.  6:08-cv-2020-Orl-31DAB**

**PRECISION AIRMOTIVE**
**CORPORATION; PRECISION**
**AIRMOTIVE, LLC; and PRECISION AIR,**
**INC.,**

               **Defendants.**

## ORDER

This matter comes before the Court after a hearing on November 23, 2010, on the Motion to Strike Undisclosed Expert Opinion and Testing (Doc. 97) filed by Defendant Precision Airmotive Corporation ("Precision") and the response in opposition (Doc. 106) filed by the Plaintiff, Margaret North ("North").

**I.**      **Background**

Robert North died on December 2, 2006, when the airplane he was piloting crashed near the runway in Mt. Snow, Vermont. The Plaintiff is his widow and the administratrix of his estate. She contends that the crash was caused by the failure of an engine component manufactured by Precision's predecessor. (For simplicity's sake, both entities are referred to throughout this order as "Precision"). Specifically, North contends that the fuel injection servo in the plane's right engine developed a crack, permitting fuel to pass into the air side of the servo. This additional fuel made the air/fuel mixture excessively rich, leading to a failure of that engine. North contends that

the engine failure occurred just as her husband was attempting a go-around,[1] causing the plane to enter an uncontrollable right turn, resulting in the crash.

## II. Legal Standards

Pursuant to Federal Rule of Civil Procedure 26, experts who may testify at trial must provide a report containing

> (I) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed.R.Civ.P. 26(a)(2)(B). The expert must supplement these reports "in a timely manner" if he or she learns that in some material respect the report is incomplete or incorrect, unless the additional or corrective information is made known to the other party during the discovery process or in writing. Fed.R.Civ.P. 26(e)(1). The expert's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Fed.R.Civ.P. 26(e)(2). If a party fails to provide information as required by Rule 26(a) or 26(e), the party is not allowed to use that information at trial, unless the failure was substantially justified or is harmless.

---

[1] Generally speaking a "go around" is an aviation maneuver in which a pilot, after beginning to descend, aborts the landing so as to circle around and make another attempt to land.

Fed.R.Civ.P. 37(c).  The burden of establishing that a failure to disclose was substantially justified or harmless is on the nondisclosing party.  *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D.Ga. 2006).

**III.   Analysis**

Precision seeks to prohibit four of North's expert witnesses from introducing certain facts and opinions at trial.  The four experts are Richard McSwain ("McSwain"), a metallurgist; Donald Sommer ("Sommer"), an accident reconstructionist; Al Fiedler ("Fiedler"), another accident reconstructionist; and Mark Seader ("Seader"), a fuel control expert.  Each expert's report was produced to Precision on March 23, 2010, and the depositions of these experts were conducted in late June or early July 2010.  None of the experts produced a supplemental report.  The particular facts and opinions that are the subject of this motion are discussed in turn below.

**A.   Lead particles on the air side of the fuel servo**

Aviation fuel contains lead.  McSwain testified at his deposition that he had found lead particles on the air side of the right engine fuel servo, which in his opinion represented deposits left behind by trace elements of fuel.  (Doc. 98-21 at 13).  However, neither this factual finding nor the resulting opinion were mentioned in McSwain's expert report.  Fiedler stated in his own report that "[t]race elements of fuel were found on the air side of the [servo]."  Fiedler subsequently testified that this statement was based on a factual finding made by McSwain rather than something he had himself discovered.  (Doc. 98-22 at 271-273).  In addition, although Sommer did

not mention McSwain's lead particle findings in his own report, he testified at his deposition that he was relying on those findings in support of one or more of his own opinions.[2]

According to the Defendant, McSwain testified that he made this finding in response to the report produced by one of the Defendant's experts, Dale Alexander ("Alexander"). (Doc. 98-21 at 13-14). Alexander had suggested that an element of the servo known as the "cup," which is made of leaded brass, could have been the source of the lead particles found on the air side of the servo, rather than a fuel leak. (Doc. 109-4 at 16). McSwain testified that in response to Alexander's concerns, he went back and reviewed X-rays that he had performed on the servo and found lead particles away from the cup, suggesting that the cup was not their source. (Doc. 98-21 at 13). Precision responds that the reports from Fiedler and Sommer were produced simultaneously with Alexander's report, and therefore their opinions could not have been offered to rebut his conclusion that the cup was the source of the lead particles.

It is apparent that there are in essence two factual findings at issue here, both made by McSwain and both dealing with the presence of lead particles on the air side of the servo. The first was made well before the expert reports were produced, and served as the factual underpinning for the opinions of Fiedler and Sommer addressed above. It is clear that the Defendant was also aware of this finding, as it is discussed by Alexander in his report. (Doc. 109-4 at 16). Although Fiedler and Sommer should have specified the source of the facts supporting their opinions about traces of fuel on the air side of the servo, Alexander's report shows that their failure to do so did not prejudice the Plaintiff.

---

[2] Sommer did not specify the opinion or opinions that he believes are supported by McSwain's lead particle findings.

The second factual finding, that there were lead particles found away from the cup, was disclosed by McSwain during his deposition. McSwain was disclosing a finding that, in his opinion, undermined Alexander's opinion that the lead particles came from the cup as opposed to a fuel leak. As it was offered in rebuttal, this was properly disclosed.

### B. Defective bellows versus defective servo

In his report, Sommer opined that a portion of the fuel injector servo known as the "center body bellows" was defective, allowing fuel to leak into the air side and causing engine failure. At his deposition, he testified that the entire fuel injector was defective in that it would not tolerate a failure of the bellows. The Plaintiff argues that this testimony about the fuel injector's intolerance to bellows failure is a new, previously undisclosed opinion, which Sommer should not be permitted to offer at trial.

After reviewing the pertinent portion of Sommer's testimony and his report, the Court finds that the distinction between calling the bellows defective and calling the entire servo defective is essentially one of semantics. Obviously, the servo contains the bellows, and the Plaintiff's theory is that the failure of the one led to the failure of the other, causing the entire engine to fail. In addition, Sommer's sixth opinion in his report reads as follows:

> The center body seal bellows failed in fatigue and allowed fuel to leak across the center body seal. The center body seal in the subject servo was not fit for its intended purpose and is subject to single point failure mode.

(Doc. 106-3 at 12). Although not a model of clarity, this provided sufficient notice that Sommer believes the entire servo was defective, in that a failure of a single seal could cause the entire servo to fail.

### C.     Fuel staining on cylinder intake port

McSwain found stains on the intake port of one of the cylinders in the right engine. According to McSwain's chemical analysis, the composition of the stains is consistent with that of evaporated aviation fuel.  In his report, Sommer did not refer to these stains or offer any opinion based on them.  However, at his deposition, he opined that 1) such stains show that there was excess fuel at that port and 2) an excessively rich fuel mixture must have caused the stains.  (Doc. 98-23 at 342).  Sommer testified that he did not know about McSwain's analysis of the stains at the time he produced his own report.  He testified that he formed these opinions after learning of McSwain's findings.  (Doc. 98-23 at 342).

Precision does not argue that McSwain failed to disclose his findings regarding the stains. The Court finds that it was not improper for Sommer to rely on these findings to support his own opinion that an excessively rich fuel mixture caused the right engine to fail.  In addition, the Court finds that, although Sommer did not file a supplemental report as to these additional opinions, Precision did not suffer prejudice as a result.

### D.     Post-report testing

Precision alleges, and the Plaintiff does not deny, that Sommer conducted flow bench tests on an example of the servo after the deadline for production of expert reports.  The Plaintiff asserts that the testing was done to recreate, on videotape, tests that had been conducted within the deadline.[3]  However, the Plaintiff admits that some of these post-deadline tests differed in material

---

[3]The Plaintiff says the original tests were also videotaped, but the videos were lost due to a technical problem.

ways from the original flow bench tests, and that, as a result, they produced measurements of things that were not measure during the original tests.

The Plaintiff argues that the new videotape can properly be used for purposes of demonstration, and that the additional tests were proper in that they did not result in any new opinions, just new facts.  The Court agrees with the first argument, but not the second.  To the extent that the new videotape properly illustrates the original flow bench tests, it may be used for demonstrative purposes.  However, the data generated by these post-deadline tests will not be admitted at trial, and no expert will be permitted to base an opinion on such data.

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion to Strike Undisclosed Expert Opinion and Testing (Doc. 97) is **GRANTED IN PART AND DENIED IN PART** as set forth above.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 8, 2011.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party